NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————————— )
                                  )     Hon. Harold A. Ackerman
IN RE BIO-TECHNOLOGY GENERAL CORP.   )
SECURITIES LITIGATION                        )     Civ. Action No. 02-6048 (HAA)
                                  )
———————————————————————— )     **OPINION AND ORDER**

Olimpio Lee Squitieri, Esq.
SQUITIERI & FEARON, LLP
26 South Maple Avenue
Suite 202
Marlton, New Jersey 08053
*Attorneys for Plaintiff A.F.I.K. Holding SPRL*

Roger B. Kaplan, Esq.
GREENBERG TRAURIG, LLP
200 Campus Drive
P.O. Box 677
Florham Park, New Jersey 07932

Irwin H. Warren, Esq.
Miranda S. Schiller, Esq.
Erin J. Law, Esq.
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, New York 10153
*Attorneys for Defendants*

**ACKERMAN, Senior District Judge:**

This matter comes before the Court on Defendants' Motion to Dismiss the Second

Amended Consolidated Class Action Complaint ("SAC").  For the following reasons,

Defendants' motion is GRANTED and Plaintiff's SAC is DISMISSED WITH PREJUDICE.

## I. Background

This case is a purported securities class action brought by investors who purchased shares of Bio-Technology General Corporation ("BTG") between April 19, 1999 and August 2, 2002 (the "Class Period"). BTG, now known as Savient Pharmaceuticals, Inc.,[1] is a New Jersey-based biopharmaceutical company that develops, manufactures, and markets human healthcare products. Its stock is traded on NASDAQ, and, as is required of publicly-traded companies, BTG files quarterly and annual reports with the Securities and Exchange Commission ("SEC").

During fiscal years 1999, 2000, and 2001, Arthur Andersen, L.P. ("Andersen") served as BTG's outside auditor. In this capacity, Andersen reviewed BTG's revenue and earnings data and issued unqualified, or "clean" opinions[2] on BTG's financial statements for those years. The audited financial statements appeared in the annual reports that BTG filed with the SEC. After Andersen ceased conducting public company audits, BTG retained KPMG as its new outside auditor in May 2002. On August 2, 2002, under KPMG's guidance, BTG publicly warned that a restatement of its financial results for 1999, 2000, and 2001 would be forthcoming.

On September 25, 2002, BTG filed restated year-end and quarterly results for 1999, 2000, and 2001. Nine days later, on Friday, October 4, 2002, KPMG announced that it was resigning

---

[1] On June 23, 2003, BTG changed its name to Savient Pharmaceuticals, Inc. For simplicity, this Opinion and Order will refer throughout to BTG, the Defendant entity's name during the Class Period.

[2] "An unqualified opinion, the most favorable report an auditor may give, represents the auditor's finding that the company's financial statements fairly present the financial position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with consistently applied generally accepted accounting principles." *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 643 n.17 (S.D.N.Y. 2004) (quoting *United States v. Arthur Young & Co.*, 465 U.S. 805, 818 n.13 (1984)).

as BTG's outside auditor and expressed its opinion that BTG's internal controls were deficient and needed significant strengthening.  As a result of these revelations, BTG's common stock fell to $2.10 per share on Monday, October 7, 2002, down from a Class Period high of $20.44.

BTG shareholders quickly responded to these developments by filing the first of several securities class actions on December 20, 2002.  Five other securities class actions soon followed. On September 4, 2003, this Court granted a motion to consolidate the six pending actions into the instant action, and appointed Plaintiff PKN Group ("Plaintiff") as lead plaintiff.  *See A.F.I.K. Holding SPRL v. Fass*, 216 F.R.D. 567 (D.N.J. 2003).

On March 19, 2004, Plaintiff filed a 120-page Consolidated Amended Class Action Complaint (the "First Complaint").  The First Complaint alleged that BTG and certain of its executive officers[3] (collectively "Individual Defendants") violated federal securities laws by disseminating materially false and misleading statements concerning BTG's revenue and earnings, which caused the stock price to become artificially inflated, damaging investors. Specifically, the First Complaint charged Defendants with having conducted a two-part scheme to overstate BTG's financial performance and thereby defraud investors during the Class Period. First, Plaintiff contended that BTG and its management knowingly or recklessly engaged in a pattern of accounting fraud that violated Generally Accepted Accounting Principles ("GAAP") and BTG's own internal accounting policies.  Plaintiff's contentions in this regard focused on three specific items that BTG improperly reported in its financial statements during the Class

---

[3]  The executive officers named as defendants are Sim Fass, BTG's Chairman of the Board of Directors and Chief Executive Officer during the Class Period; Yehuda Sternlicht, BTG's Vice President-Finance and Chief Financial Officer from the beginning of the Class Period until June 2001, and thereafter only Vice President-Finance; and John A. Bond, BTG's Senior Vice President-Finance and Treasurer from June 2001 until the end of the Class Period.

Period and that BTG later corrected in its restatements.  Second, Plaintiff claimed that BTG and

its management falsely attributed the source of a sharp increase in sales of its premier drug

product, Oxandrin, to the successful penetration of a new therapeutic market, when in fact BTG's

management knew that the spike in sales was the result of wholesalers stocking their inventories

ahead of an expected Oxandrin price increase.  Plaintiff alleged that Defendants' fraudulent

accounting practices and false statements regarding sales of Oxandrin violated Sections 10(b)

and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5,

promulgated thereunder.

On July 9, 2004, Defendants moved to dismiss the First Complaint pursuant to Rules 9(b)

and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform

Act of 1995 ("PSLRA").  Specifically, Defendants contended that the First Complaint failed to

plead its allegations with sufficient particularity to satisfy the heightened pleading requirements

of Rule 9(b) and the PSLRA, and therefore failed to state a claim under Rule 12(b)(6).  Under an

extended briefing schedule agreed upon by the parties, Plaintiff filed its opposition brief on

October 14, 2004, and Defendants filed their reply brief on December 22, 2004.

On August 10, 2005, this Court granted, without prejudice, Defendants' motion to

dismiss Plaintiff's First Complaint, *In re Bio-Technology Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d

574, 577-78 (D.N.J. 2005) ("Bio-Tech I"), and allowed Plaintiff thirty (30) days from the entry of

that Order to refile a second amended consolidated class action complaint.  After both parties

stipulated to a delayed schedule, Plaintiff filed this SAC, which Defendants now move this Court

to dismiss.  The SAC sets forth the same allegations as the First Complaint, but with an attempt

to provide greater particularity in an effort to overcome this Court's adverse rulings announced in

4

*Bio-Tech I*.  The Court will again assess each area of the SAC in deciding this motion to dismiss.

## II. Analysis

### A. Restated Items

As in the previous Complaint, Plaintiff currently "alleges that three items reported in BTG's financial statements during the Class Period and subsequently restated in September 2002 demonstrate that Defendants engaged in a pattern of accounting fraud during the period for which Andersen audited BTG's financial statements."  *Bio-Tech I*, 380 F. Supp. 2d 579-80.

#### 1. Improper Reporting of DePuy Fee

The DePuy Agreement fee is a $5 million contract fee that BTG reported as income in Q2 2000, but subsequently restated in September 2002 after KPMG, its new auditor, disagreed with Andersen's assessment of the DePuy fee back in Q2 2000.

##### a. Motive and Opportunity

As in *Bio-Tech I*, the Court will begin its analysis here with the alleged improper reporting of the DePuy contract fee.  With respect to the fee, Plaintiff raises the same primary allegations regarding motive and opportunity to commit fraud.  Plaintiff, in the SAC, repeats a verbatim recitation of the first Complaint regarding the allegation of a large percentage overstatement of originally reported net income.  (SAC ¶ 61.)  The Court rejected such allegations the first time as failing to "establish motive sufficient for creating a strong inference of scienter."  *Bio-Tech I*, 380 F. Supp. 2d at 581.  The Court finds no reason to change its ruling on these allegations and thus similarly finds that they do not establish motive sufficient for creating a strong inference of scienter.

5

This Court, in *Bio-Tech I*, also held that Plaintiff's allegations of motive were insufficient with respect to BTG's acquisition of Myelos Corporation ("Myelos").  This Court's reasoning questioned how the Myelos acquisition, which occurred in March 2001, could have been a motive for the alleged improper reporting of the DePuy contract fee in Q2 2000.  *Bio-Tech I*, 380 F. Supp. 2d at 581-83.  Specifically, the Court declared that Plaintiff needed to allege "additional, particularized allegations to explain these apparent discrepancies and connect Defendants' reporting of the DePuy agreement fee with the Myelos acquisition."  *Id*. at 583.

Plaintiff has attempted to remedy the first complaint's shortcomings in this regard.  Plaintiff admits that the inclusion of the entire DePuy contract as income in Q2 2000 did not violate BTG's accounting policy in that quarter.  Instead, Plaintiff alleges that the inclusion as income became a misrepresentation in February 2001 when BTG reported its FY 2000 results.  (SAC ¶ 84(b).)  That is, BTG's adoption of SEC Staff Accounting Bulletin ("SAB") 101[4] allegedly took effect at the end of 2000 such DePuy-type fees should have been amortized rather than wholly included in any one quarter (or year).

Specifically, Plaintiff alleges that "Defendants' scienter as to the DePuy contract revenues was heightened because a review of all contracts for compliance with SAB 101 had been performed in preparing the full year 2000 financial statements of the Company."  (SAC ¶ 84(c).)  But such allegation is in direct contradiction to an earlier, more carefully articulated, allegation in the SAC that "defendants conducted a review of contract fees recorded up-front on long-term

---

[4] "SAB 101 provides an SEC staff interpretation of applicable GAAP relating to revenue recognition and calls for deferral of revenue unless an up-front fee, such as the DePuy payment, is received 'in exchange for products or services performed that represent the culmination of a separate earnings process.'"  *Bio-Tech I*, 380 F. Supp. 2d at 580.

contracts entered into in years prior to 2000." (SAC ¶ 60(e)(i).)

In the very next sub-paragraph, Plaintiff asserts that because the pre-2000 contracts were being reviewed for SAB 101 compliance, "an inference is raised that contracts entered into <u>during</u> 2000 were likewise reviewed for the purpose of SAB 101 compliance." (SAC ¶ 60(e)(ii) (emphasis in original).) That is, Plaintiff does not allege that the contracts from 2000 were in fact reviewed for SAB 101 compliance and that the Individual Defendants somehow consciously chose to leave the Q2 2000 recordation of the DePuy fee as originally recorded. Instead, Plaintiff reasons somewhat obliquely that because there is an *inference* that contracts entered during 2000 were reviewed, then there is a *strong* inference of scienter that the Individual Defendants improperly reported the DePuy fee in FY 2000. In essence, Plaintiff asks this Court to find a strong inference on the basis of a weak one. The Court declines Plaintiff's request in this regard.

Additionally, in *Bio-Tech I* this Court noted that Plaintiff failed to make sufficient allegations that "any of the Individual Defendants received 'a concrete and personal benefit' from the alleged fraud" of improperly reporting the DePuy fee in FY 2000 within a month of the Myelos acquisition. *Bio-Tech I*, 380 F. Supp. 2d at 583 (quoting *GSC Partners*, 368 F.3d at 237). Plaintiff has not, in the SAC, remedied this deficiency that the Court so carefully articulated in its previous Opinion. Overcoming this deficiency is a prerequisite to a finding of motive and opportunity. Therefore, the Court finds that Plaintiff has failed to plead sufficient facts of motive based on the Myelos acquisition to create a strong inference of scienter.

### b. Circumstantial Evidence of Scienter

As noted in *Bio-Tech I*, an alternative means by which a private securities fraud plaintiff may establish a strong inference of scienter is by alleging specific facts constituting "strong

circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners*, 368 F.3d at

237 (quoting *In re Burlington*, 114 F.3d at 1418). In this regard in *Bio-Tech I*, this Court,

however, devoted substantial attention to the issue of "group pleading." This Court held that

Plaintiff's allegations failed as a matter of law because they were made under a theory of group

pleading. *Bio-Tech I*, 380 F. Supp. 2d at 584. Plaintiff, in its SAC, continues to use much of the

same group pleading language this Court rejected, but adds one paragraph in an attempt to

overcome the group pleading problem.

### i. Group Pleading

Specifically, Plaintiff asserts that the Individual Defendants are responsible for the false

statements alleged throughout the SAC because they signed BTG's SEC filings:

> Defendants Fass and Sternlicht signed the Company's Form 10-Qs
> and 10-Ks filed with the SEC with respect to fiscal 1999 and 2000
> and the Company's Form 10-Q for the first quarter of fiscal 2001.
> Defendants Fass and Bond signed the SEC's Form 10-Qs filed with
> respect to the second and third quarters of fiscal 2001. In addition,
> Sim Fass personally presented the Company's financial results in
> BTG's earnings releases and thereby personally represented them
> to be truthful.

(SAC ¶ 39.) Nowhere else in the SAC does Plaintiff even attempt to tie any particular Defendant

to a particular allegation. Instead, Plaintiff continuously alleges against "Individual Defendants,"

which Plaintiff defines as "Fass, Sternlicht and Bond." (SAC ¶ 39.) Plaintiff leaves to this Court

the task of extrapolating from ¶ 39, into each of the remaining 298 paragraphs spread across 162

pages, which Defendant allegedly made a false statement.[5]

_____

[5] At this juncture, the Court notes with great concern that Plaintiff includes the following
as footnote 46 in its Opposition to Defendants' Motion to Dismiss:

> Defendant Warren signed the Form 10-Qs filed during the Class

Plaintiff argues that it no longer relies on the group pleading doctrine by virtue of ¶ 39 in

the SAC.  That is, Plaintiff alleges that because the Individual Defendants signed various SEC

filings, they are responsible for making statements and therefore liable under § 10(b).  In support

of this argument, Plaintiff principally relies on a handful of cases, published and unpublished,

from jurisdictions other than the Third Circuit and the District of New Jersey.  Because the Third

Circuit has not yet decided whether group pleading has survived enactment of the Private

Securities Litigation Reform Act of 1995 ("PSLRA"), *see Bio-Tech I*, 380 F. Supp. 2d at 584

(collecting cases), the Third Circuit understandably has not yet decided whether the simple

allegation of signing an SEC filing is sufficient to place an allegation outside the context of

group pleading.

While the Third Circuit has not spoken on this issue, two District Courts within this

Circuit have addressed the issue and held that allegations of signing SEC filings are sufficient to

---

> Period. (Complaint ¶¶ 149, 151, 153, 167, 169, 172, 184).  The
> form 10-Ks were signed by defendants Hickey and Van Riper in
> 1999 (Compl. ¶143), by defendants Hickey, Van Riper and Warren
> in 2000 (Compl. ¶159), and by defendants Hickey, Kelsey and
> Warren in 2001.

(Pl.'s Br. at 29 n.46.)  This footnote caused the Court considerable confusion because, as noted
above, the SAC makes mention only of Defendants Fass, Sternlicht and Bond.  After a not
inconsiderable expenditure of judicial resources, the Court discovered that footnote 46 was also,
and more properly, included by Plaintiff's counsel as footnote 26 in its opposition brief to a
motion to dismiss filed in *Senn v. Hickey*, No. 03-4372 (D.N.J. filed April 25, 2005), a case
completely unrelated to the present action, with Plaintiff's counsel as the only common
denominator.

In *Senn v. Hickey*, there were in fact defendants named Warren, Hickey, Van Riper and
Kelsey; there are no such defendants in the instant action.  This Court recognizes that the
inherent nature of modern litigation and word processing lends itself to some "cut-and-pasting"
of boilerplate from one case to the next; this example of duplication, however, is not easily
overlooked.  The Court urges counsel to exercise greater diligence in its future filings.

9

bring corresponding allegations outside of the group pleading doctrine.  *See In re DVI, Inc. Sec.
Litig.*, 2005 WL 1307959 at *8 (E.D. Pa. May 31, 2005)*; In re Reliance Sec. Litig.*, 135 F. Supp.
2d 480, 503-04 (D. Del. 2001); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1062 (9th
Cir. 2000).  As noted above, reading the SAC in the light most favorable to the Plaintiff, this
Court has diligently and carefully attempted to discern from SAC ¶ 39 which Defendants are
potentially liable regarding the alleged improper reporting of the DePuy contract fee.

Plaintiff has clarified that the alleged improper reporting did not occur in reporting Q2
2000 results, but instead occurred in the reporting of FY 2000 results.  As such, according to
SAC ¶ 39, the only Defendants to which this alleged improper reporting can be attributed based
upon SEC filings are Messrs. Fass and Sternlicht because they allegedly signed BTG's "Form 10-
Qs and 10-Ks filed with the SEC with respect to fiscal 1999 and 2000."  (SAC ¶ 39.)

All of Plaintiff's allegations regarding the alleged FY 2000 reporting of the DePuy fee
use the collective "Individual Defendants."  Despite the use of this collective moniker, after
reasonable deduction it is clear that Defendant Bond cannot be included among the "Individual
Defendants" with respect to the DePuy fee because he is not alleged to have signed the FY 2000
SEC filing.  Moreover, Defendant Bond is alleged to have become "Senior Vice President-
Finance and Treasurer of BTG" in June 2001 (SAC ¶ 38), well after the alleged improper
reporting of the DePuy fee in the FY 2000 results released in February of 2001.

While the Court expresses reservations regarding the extent to which Plaintiff relies on
the Court's extrapolation from SAC ¶ 39 to other allegations in the SAC, the Court finds that
Plaintiff has made sufficient allegations outside of the group pleading doctrine against
Defendants Fass and Sternlicht with respect to the DePuy fee to allow the Court to consider the

allegations of circumstantial evidence of scienter, as the Court could not do in *Bio-Tech I*.  *See Bio-Tech I*, 380 F. Supp. 2d at 584.  That is, while the Court could not, as a matter of law, evaluate many of the allegations regarding the DePuy fee in *Bio-Tech I* due to improper group pleading, Plaintiff's allegations in the SAC can and will be evaluated for purposes of the present motion to dismiss.

### ii. Recklessness

To reiterate, an alternative means by which a private securities fraud plaintiff may establish a strong inference of scienter is by alleging specific facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness."  *GSC Partners*, 368 F.3d at 237 (quoting *In re Burlington*, 114 F.3d at 1418).  "A reckless statement is one 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant' or is so obvious that the actor must have been aware of it.'"  *Bio-Tech I*, 380 F. Supp. 2d at 583 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999)).

In *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 -79 (3d Cir. 2006), the Court of Appeals vacated the District Court's dismissal of plaintiffs' 10(b) claims.  In that case, the Third Circuit found that plaintiffs pled with particularity by alleging facts such as defendants' signing of millions of dollars in checks to entities controlled by individuals who later pled guilty to fraud in regard to certain related transactions.  *Id*. at 278.  One of the defendants was alleged to have controlled all of the bookkeeping and to have prevented other accounting staff members in the company from interfering in the allegedly fraudulent transactions.  *Id*.  The Third Circuit ultimately concluded that plaintiffs had "attributed to each of the Officers specific knowledge

11

and conduct." *Id*. at 279.

Here, Plaintiff's allegations regarding circumstantial evidence of recklessness focus on BTG's failure to apply SAB 101 to the FY 2000 financial statements such that the DePuy fee, which was originally recognized in Q2 2000, would be restated in FY 2000 to reflect only a portion of the earned fee.  More specifically, Plaintiff alleges that because Defendants knew about SAB 101 as early as Q3 2000 and how it would change the reporting of contract fees, Defendants knew that the FY 2000 financial statements constituted an improper reporting of the DePuy fee.  Plaintiff points to public statements by BTG that the company was reviewing pre-2000 contracts as evidence that it was also reviewing year 2000 contracts.  In the alternative, Plaintiff alleges that failure to review contracts entered in 2000 constitutes recklessness.

Defendants' statements regarding the DePuy fee, as Plaintiff alleges them, do not rise to the level of recklessness.  Plaintiff has not alleged anything remotely similar to the "specific knowledge and conduct" that the Third Circuit found alleged in *In re Suprema*.  Moreover, Plaintiff's allegations do not establish that Defendants' statements amounted to an "extreme departure from ordinary care."  *See In re Advanta*, 180 F.3d at 535.  At most, Plaintiff's allegations establish negligence on the part of the Defendants.  *See In re Alpharma*, 372 F.3d at 150 (3d Cir. 2004) (holding that plaintiff's complaint alleged "little more than mismanagement.")  Because Plaintiff has not alleged circumstantial evidence of conscious misbehavior or recklessness, the Court finds that Plaintiff's allegations fail as a matter of law to create a strong inference of scienter with respect to the DePuy contract fee.

### 2. Reversal of the $2 Million Q2 1999 Oxandrin Sale and Q1 2001 Repurchase

For purposes of brevity and where helpful, the Court will reference the previous Opinion

in addressing the allegations that the 1999 Oxandrin sale and subsequent repurchase in 2001 represent two separate frauds.  A prima facie case of fraud in a Rule 10b-5 action requires a plaintiff to plead facts establishing that "(1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury."  *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004).

In *Bio-Tech I*, this Court concluded that Plaintiff satisfied prong one by adequately pleading allegations "establishing materially false or misleading statements relating to the 1999 Oxandrin sale and 2001 Oxandrin repurchase.  *Bio-Tech I*, 380 F. Supp. 2d at 586.  Plaintiff continues to satisfy prong one in the SAC and this Court reaffirms its ruling on that issue for the same reasons.

With respect to prong two, however, Plaintiff, in *Bio-Tech I*, failed to satisfy the motive and opportunity element for a finding of a strong inference of scienter.  *Id*. at 587.  Moreover, as with the DePuy fee issue, Plaintiff's reliance on group pleading prevented this Court from analyzing the allegations for a finding of circumstantial evidence of scienter.  *Id*.  Consequently, because this Court found that Plaintiff failed to allege sufficient facts that Defendants acted with scienter, it did not address the third prong regarding reliance and damages.

Turning to the second prong, scienter, *Bio-Tech I* held that "generalized allegations of motive and opportunity do not suffice to create a strong inference of scienter unless accompanied by particularized allegations of 'a concrete and personal benefit to the individual defendants resulting from the fraud.'"  *Bio-Tech I*, 380 F. Supp. 2d at 586 (quoting *GSC Partners*, 368 F.3d

at 237).  In its previous Opinion, this Court ultimately held that "Plaintiff has not alleged that the Individual Defendants personally sought to benefit from their allegedly fraudulent reporting of the 1999 Oxandrin sale and 2001 repurchase." *Id.* at 587.  Here, similarly, Plaintiff again fails to make particular allegations of a concrete and personal benefit to the Individual Defendants resulting from the fraud.  As a result, this Court is forced to find, as it did the first time, that Plaintiff's allegations do not establish a strong inference of scienter through motive or opportunity.

Under the second prong, scienter can also be established by alternatively alleging facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners*, 368 F.3d at 237.  In the previous Complaint, Plaintiff's reliance on group pleading categorically prevented this Court from finding that Plaintiff had alleged facts constituting conscious misbehavior or recklessness.  *Bio-Tech I*, 380 F. Supp. 2d at 587.  As with the DePuy fee issue, Plaintiff now attempts to remedy the group pleading problem through its allegations wholly contained within ¶ 39 of the SAC, the paragraph alleging that Defendants Fass, Sternlicht and Bond signed relevant SEC filings on behalf of BTG.

Consistent with this Court's finding that the allegations in ¶ 39 sufficed to rescue the SAC from the now-defunct group pleading doctrine, this Court similarly finds that the same paragraph is sufficient to permit this Court to address Plaintiff's other allegations in connection with the 1999 sale and 2001 repurchase of Oxandrin.  The Court's task in that regard is to determine whether such allegations constitute strong circumstantial evidence of conscious misbehavior or recklessness.

Again, "[a] reckless statement is one 'involving not merely simple, or even inexcusable

14

negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *Bio-Tech I*, 380 F. Supp. 2d at 583 (quoting *In re Advanta*, 180 F.3d at 535).

For purposes of clarity, the Court notes that Plaintiff's SAC includes considerably more allegations regarding this Oxandrin sale and repurchase issue than the Complaint this Court addressed in its previous Opinion.  According to Plaintiff, a large portion of the information regarding this issue came from the revelation by Defendants, in their brief to this Court on the first motion, that the 1999 sale of Oxandrin was to the company SciTech.  With this revelation, Plaintiff substantially increased the length of its new Complaint.

Plaintiff alleges disclosure violations regarding the Oxandrin sale to SciTech in 1999.  First, Plaintiff alleges that investors were entitled to know that SciTech was the purchaser of this drug because the deal was allegedly "unusual" and particularly because previous deals between BTG and SciTech had been, allegedly, unsuccessful.  Plaintiff also alleges that the omission of SciTech's name from BTG's filings is a disclosure violation because SciTech had been specifically named in previous BTG SEC filings for two other long-term deals.

Nowhere, however, does Plaintiff ever allege any law, rule or policy that required BTG to specifically identify its customers by name.  The fact that BTG named SciTech in previous filings for two other *long-term* deals certainly does not give rise to a strong inference of scienter for Defendants' omission of the customer's name in what BTG reported as a one-time sale in 1999.  Moreover, the categorization of the SciTech deal by BTG as a one-time sale can easily be viewed as a conservative description, thus advising the market not to expect any future sales.

15

Ultimately, Plaintiff fails to allege specific facts indicating that the Individual Defendants' omission of SciTech's name rises to the level of an "extreme departure from the standards of ordinary care." *In re Advanta*, 180 F.3d at 535.

Plaintiff next alleges that the sale of Oxandrin in 1999 to SciTech was a "sham" sale because SciTech allegedly had the right, but no practical ability to re-sell the Oxandrin in certain Asian territories. That is, Plaintiff alleges that SciTech had rights, under the sale, to sell Oxandrin in several Asian territories where Oxandrin had not been licensed for sale, "or in South Koriea [sic], where it had not been commercialized." (Pl.'s Br. at 7 (citing SAC ¶ 68(a)).) Plaintiff argues that the sale to SciTech was obviously a "sham" because "Defendants don't [sic] attempt to explain why SciTech would buy Oxandrin if it couldn't [sic] be resold." (Pl.'s Br. at 7.)

This argument inverts the standard by placing the burden on a defendant. The correct standard, instead, is whether *plaintiff* has alleged sufficient facts demonstrating circumstantial evidence of recklessness sufficient to give rise to a strong inference of scienter on the part of the defendants. The Court finds that Plaintiff has not alleged sufficient facts in this matter. Moreover, it defies logic to contend that the Individual Defendants acted with scienter in supposedly orchestrating this "sham" sale when SciTech could easily have made the investment in Oxandrin while in the process of attempting to obtain regulatory approvals in the assigned territories. A business decision to buy the product before navigating through the bureaucracy of regulatory approval in multiple countries that would permit resale certainly does not give rise to an inference of any recklessness on the part of Individual Defendants in reporting or approving the sale.

16

Finally, Plaintiff alleges that in Q1 2001 BTG improperly recorded its repurchase/return of the Oxandrin sales it made to SciTech in 1999.  Plaintiff alleges that BTG *increased* Q1 2001 cost of goods sold by the gross profit ($1,615,000) of the sale, when it allegedly should have *reduced* Q1 2001 revenues by the amount of the entire reversal ($2 million).  Again, Plaintiff fails to connect the dots and show how an alleged GAAP violation rises to the level of circumstantial evidence of recklessness.  While the restatement indicates that a mistake was made, that does not by itself show *recklessness* in the initial recordation.  *See Bio-Tech I*, 380 F. Supp. 2d at 588 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.") (quoting *Nappier v. PriceWaterhouseCoopers LLP*, 227 F. Supp. 2d 263, 276 (D.N.J. 2002)).  Accordingly, this Court finds that Plaintiff has failed to create a strong inference of scienter regarding the return of the Oxandrin in Q1 2001.

### 3. Improper Capitalization of Oxandrin Manufacturing Expenses

The third restated item concerns BTG's alleged improper capitalization of certain research and development ("R&D") expenses relating to Oxandrin.  In late 2002, BTG announced that its new auditor, KPMG, had recommended that the particular R&D expenses now in question should have been expensed when they were incurred in 1999-2001 rather than capitalized.  In its previous Opinion, this Court found that Plaintiff's initial Complaint failed to allege motive and opportunity.  *Bio-Tech I*, 380 F. Supp. 2d at 588.  The Court reaffirms its prior ruling in regards to Plaintiff's failure to plead facts alleging motive and opportunity sufficient for a finding of scienter.

With respect to Plaintiff's allegations regarding circumstantial evidence of conscious misbehavior or recklessness, this Court found in its previous Opinion that Plaintiff pled

17

insufficiently particularized facts that "at best established a weak inference of scienter." *Id*. at

589.  This Court's previous Opinion provided several rationales for its finding.  Specifically, the

Court noted that Plaintiff did not "plead that Defendants capitalized Oxandrin costs *in spite of*

having concluded that such costs were properly characterized as research and development

costs." *Id*. at 588.  Plaintiff does not, in its Second Amended Complaint, address this Court's

concern on this point.  The Court also noted that Plaintiff could "plead particularized facts

allowing this Court to infer from the nature of the capitalized costs that Defendants' failure to

recognize them as R&D was severely reckless." *Id*.  Plaintiff again failed to address this concern

in its Second Amended Complaint.

> The Court also noted, *by way of example*, the following:

>> Plaintiff might have alleged recklessness by pleading facts
>> demonstrating that the relevant guidelines for classifying costs as
>> research and development were of such a simple nature as to cast
>> serious doubt on Defendants' contention that they acted reasonably
>> and in good faith.

*Bio-Tech I*, 380 F. Supp. 2d at 589 (citing *In re MicroStrategy*, 115 F. Supp. 2d at 637-38 (noting

that the relative simplicity of the accounting principles involved was a factor in finding

scienter)).  Plaintiff, in its Second Amended Complaint, seized on this Court's example by

adding numerous paragraphs that allege how "simple" was the nature of classifying research and

development costs.  Plaintiff, in its brief, characterizes this Court's use of the above example as

"the operative factor for demonstrating recklessness with respect to this claim."  (Pl.'s Br. at 13.)

Plaintiff, both in its Second Amended Complaint and in its brief, places entirely too much

emphasis on the value of the above example regarding "simplicity."  Even a perfunctory analysis

of *In re Microstrategy*, the case to which this Court cited on the "simple nature" point, reveals

that simplicity of accounting guidelines is merely *one of several* factors to be examined in determining whether scienter is sufficiently pled.  Other factors include the "large magnitude of the misstated financials and the repetitiveness of the GAAP violations."  *In re MicroStrategy*, 115 F. Supp. 2d at 638.  In the instant matter, Plaintiff completely neglects to address any of the other factors, focusing entirely on the example of one of the factors cited by this Court.

Moreover, the simplicity of the issue in *In re MicroStrategy* is not sufficiently analogous to the accounting issue in this case.  In that case, the court addressed the issue of whether revenue recognition prior to contract execution constituted a "simple" accounting guideline.  *Id*.  The instant issue of whether creating a 10mg tablet, as opposed to the 2.5mg tablet in use at the time, constitutes an R&D cost or a "start-up" cost, does not lend itself so easily to a determination that the guidelines on this point are "simple."

More specifically, in *In re MicroStrategy*, the defendant PriceWaterhouseCoopers had its own publication entitled "The User-Friendly Guide to Understanding Software Revenue Recognition."  *In re MicroStrategy*, 115 F. Supp. 2d at 638 n.36.  The *In re MicroStrategy* court found this persuasive in concluding that the issue of revenue recognition prior to contract execution was itself a relatively simple guideline.  There is nothing remotely similar in simplicity or persuasiveness regarding the issue of expensing versus capitalizing R&D/start-up costs.  But even if these cases were considered identical in terms of simplicity, the court in *In re MicroStrategy* had at least two other factors weighing in favor of scienter: magnitude of misstated financials and repeated GAAP violations.  Plaintiff has provided this Court with nothing on these factors, or any other factors.

Defendants contend that Financial Accounting Standards Board Statement 2 ("FAS 2")

19

and Statement of Position 98-5 ("SOP 98-5") must be read together to dictate that all pre-operating costs should be expensed, and that this alone indicates complexity.  For purposes of completeness, this Court recognizes that a rule does not instantly become complex just because understanding the rule requires resort to various sources.  *See In re MicroStrategy*, 115 F. Supp. 2d at 638.  Thus, the fact that FAS 2 and SOP 98-5 must be read together does not automatically render the rule complex.  Nevertheless, Plaintiff has not plead sufficient facts regarding the simple nature of this accounting principle.  Moreover, Plaintiff has not plead any facts regarding the other factors to be taken into consideration in determining scienter.  As a result, this Court finds that Plaintiff's allegations regarding BTG's capitalization of Oxandrin manufacturing expenses are insufficient to create a strong inference of scienter.

### B. False and Misleading Statements regarding Oxandrin

The remainder of Plaintiff's Second Amended Complaint identifies numerous allegedly false or materially misleading statements that Defendants made.  As an initial matter in the previous Opinion, this Court considered Plaintiff's use of confidential witnesses in the broader context of whether Plaintiff's general allegations stated a claim under the PSLRA.  *Bio-Tech I*, 380 F. Supp. 2d at 591.  The Court reaffirms its decision to consider Plaintiff's use of confidential witnesses, both the ones used in the previous Complaint and the new ones added in the Second Amended Complaint.  Similarly, this Court found that Plaintiff had sufficiently pled the existence of certain material misrepresentations or omissions, *see id.* at 592-93, and this Court accordingly reaffirms those individual findings.  Also, on the issue of scienter, this Court held that "[w]ithout particularized allegations connecting Defendants' statements on Oxandrin sales with the Myelos acquisition, Plaintiff's allegations of motive and opportunity are legally

20

insufficient to create a strong inference of scienter." *Id*. at 595.  The Court reaffirms its ruling with respect to motive and opportunity because Plaintiff has done little to remedy this insufficiency.

### 1. Circumstantial Evidence of Scienter

By contrast, Plaintiff has, in the SAC, focused most of its energy in trying to establish circumstantial evidence of scienter.  This Court, in its previous Opinion, made several conclusions regarding Plaintiff's circumstantial evidence of scienter, *see id*. at 596-97, and ultimately held that Plaintiff "failed to create a strong inference of scienter."  *Id*. at 597. Specifically, this Court held that "Plaintiff's circumstantial evidence fails as a matter of law to create a strong inference of scienter because Plaintiff conspicuously neglects the critical step of connecting the Oxandrin sales reports and the data therein with the named Individual Defendants in this case: Sim Fass, Yehuda Sternlicht, and John Bond."  *Id*. at 596.  This Court also expressed concern that Plaintiff had not alleged that the Individual Defendants had ever reviewed the contents of the sales reports in issue.  *Id*.

In response, Plaintiff, in its SAC, alleges that new Confidential Witness ("CW") 4 "states that defendants Bond and Sternlicht were [] on the distribution list [of the sales reports] and that Sim Fass also received the reports." (Pl.'s Br. at 17) (citing SAC ¶¶ 254-56).)  Plaintiff's response on this point falls short of this Court's rather explicit roadmap because there is nothing in the SAC to indicate that the Individual Defendants reviewed the contents of the specific reports that would have given them the requisite knowledge.  Just because they were in possession of voluminous sales reports, it does not necessarily follow that their job required them

21

to pore over the reports in the level of detail Plaintiff now wants to impute to them.  Moreover,

Plaintiff cites no caselaw to support its position that mere possession of voluminous sales reports

is sufficient to constitute the requisite knowledge such that making a statement contrary to those

reports would rise to the level of actionable securities fraud.

This Court, in its previous Opinion, expressed concern over imputing such detail to the

Individual Defendants: "[I]n the absence of any allegation of a specific corporate policy requiring

the Individual Defendants to be involved in reviewing Oxandrin sales data, the Court is not

prepared to impute detailed knowledge of BTG's monthly and quarterly sales data." *Id*. at 596.

Plaintiff still does not allege any such policy and this Court continues to refuse to impute such

detailed knowledge.

As another clear roadmap for Plaintiff, this Court noted in its previous Opinion that:

> Plaintiff could have pled circumstantial evidence of scienter by
> showing that BTG had a specific policy requiring the Individual
> Defendants to review Oxandrin sales reports in the periods in
> which they were provided to BTG's sales staff.  Plaintiff might
> also have pled that [] BTG had a policy whereby the sales staff
> would routinely summarize the Oxandrin sales data and deliver the
> summaries to the Individual Defendants for review.

*Id*. at 597.  For this proposition, this Court cited *Nursing Home Pension Fund, Local 144 v.*

*Oracle Corp.*, 380 F.3d 1226, 1231, 1234 (9th Cir. 2004) and recognized that case as finding a

"strong inference of scienter <u>based in part</u> on allegations that top management closely monitored

real-time sales database and had a 'detail-oriented' management style."  *Bio-Tech I*, 380 F. Supp.

2d at 597 (emphasis added).  Plaintiff holds tight to this Court's dicta, but only insofar as it

appears beneficial to them.

What Plaintiff ignores and the Ninth Circuit clearly identifies is that in *Nursing Home*, "Plaintiffs allege specific admissions from the three top executive officers." *Nursing Home*, 380 F.3d at 1234. For example, one of the named defendants was quoted as saying "I can see every deal out there that my reps around the world are working." *Id*. at 1231. In addition, another defendant stated: "I was involved in an awful lot of these deals." *Id*. at 1232. By way of another example, the Ninth Circuit quoted the CEO as declaring: "I love getting involved in every detail of the business." *Id*. at 1234. Moreover, one of the defendants made a personal stock sale to the tune of $900 million just prior to the company's negative announcements. *Id*. at 1232.

Here, by contrast, Plaintiff simply cites new Confidential Witness 6 as having "characterized Fass as a 'micromanager' who wanted to know everything." (SAC ¶ 258.) Plaintiff then categorically asserts that "[t]hese allegations are stronger then [sic] those in" *Nursing Home*. (Pl.'s Br. at 17.) Unfortunately for Plaintiff, simply asserting it does not make it so. Plaintiff does not allege anything remotely similar to the level of detail asserted in *Nursing Home*. Moreover, even if Plaintiff's allegations were considered similar in regard to the "micromanager" issue, Plaintiff still falls short of the standard in *Nursing Home* because the SAC contains none of the bolstering allegations of that case, *e.g.*, the large-scale stock sale at a very suspicious time. This Court notes again that *Nursing Home* found a strong inference of scienter based <u>in part</u> on the detail-oriented nature of the top management; the Ninth Circuit made no such finding on this allegation alone.

Aside from the basic insufficiency of Plaintiff's SAC, the Court notes that Plaintiff's brief fails to cite any relevant caselaw to support its position regarding circumstantial evidence of scienter and makes monumental leaps in logic without establishing the requisite connections.

23

Two of the headings in Plaintiff's brief encapsulate the problem: "Defendants Disclosed Underlying Sales by Gentiva to Wholesalers Prior to Late 2000, So They Likewise Had this Data in 2001 and Knew Its Relevance" and "BTG Announced in 2000 that Wholesalers Were Stocking-Up in Anticipation of a Price Hike, So Defendants Knew the Same Had Occurred in Q1 2001." (Pl.'s Br. at 17, 18.)  These headings are emblematic of Plaintiff's failure to plead in such a manner as to create a strong inference of scienter.  Plaintiff asks this Court to recognize that a strong inference of scienter has been established based upon an assertion by Plaintiff that because Defendants did one thing in one year, all the same facts held constant the next year "so they likewise" had the requisite scienter.  The chasm this Court must traverse to reach Plaintiff's conclusion is simply too great.

As a result, this Court finds that Plaintiff once again failed to create a strong inference of scienter with respect to the false and misleading statements alleged in the SAC.

### 2. Safe Harbor

As in the previous Opinion, because "Plaintiff has failed to create a strong inference of scienter with respect to BTG's statements concerning Oxandrin, the Court need not address the applicability of the PSLRA's safe harbor provision for forward-looking statements."  *Bio-Tech I*, 380 F. Supp. 2d at 597.

### C. Independent Corporate Liability

Finally, Plaintiff asserts that Defendants' motion to dismiss should be denied as to the corporate entity, even if granted as to the Individual Defendants.  The relevant portion of Plaintiff's brief on this point argues that it need not prove that any particular individual acted

with scienter; instead, proof of the company's collective knowledge and intent is sufficient.
(Pl.'s Br. at 27) (citing *In re WorldCom Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005).)

While Plaintiff accurately cites *In re WorldCom* for this proposition, the law is far from
clear on this issue, even within the Second Circuit.  *See In re Dynex Capital, Inc. Sec. Litig.*, Civ.
No. 05-1897, 2006 WL 1517580 at *2 (S.D.N.Y. Jun 02, 2006) (recognizing split of authority
between Second Circuit and other courts regarding whether "collective scienter" is a viable
theory and granting right to appeal that issue due to conflicting authority within the Second
Circuit) (collecting cases).  The weight of authority is against the Second Circuit on this point
and has been growing moreso.  *See In re Sonus Networks, Inc. Sec. Litig.*, Civ. No. 04-10294,
2006 WL 1308165 at *23 (D. Mass. May 10, 2006) (following the Fifth and Ninth Circuits in
finding it "appropriate to look to the state of mind of the individual corporate official or officials
who make or issue the statement . . . rather than generally to the collective knowledge of all the
corporation's officers and employees acquired in the course of their employment").  Moreover,
this Court is not aware of any case within the Third Circuit that would provide guidance.

Even if the Second Circuit's decision in *In re WorldCom* constituted the controlling
authority on this issue, which it does not, Plaintiff has still failed to create the strong inference of
scienter on the part of the corporate entity BTG.  As a result, the Court finds that BTG is not
independently liable and Defendants' motion to dismiss Count I must be granted as to all
Defendants.

### D. Section 20(a) Control-Person Liability

Count II of the SAC seeks to hold Defendants secondarily liable as "control persons"

under Section 20(a) of the Exchange Act.  For the same reasons noted in the previous Opinion,

namely because Plaintiff has failed to plead sufficiently a violation of Section 10(b) or Rule 10b-

5, Defendants' motion to dismiss Count II must be granted.  *See Bio-Tech I*, 380 F. Supp. 2d at

597.

Finally, this Court notes that there is an issue with respect to whether the current

dismissal should be with or without prejudice.

> One of Congress' objectives in enacting the PSLRA was "to
> provide a filter at the earliest stage (the pleading stage) to screen
> out lawsuits that have no factual basis."  This objective would be
> frustrated where "there is a stark absence of any suggestion by the
> plaintiffs that they have developed any facts since the action was
> commenced which would, if true, cure the defects in the pleadings
> under the heightened requirements of the PSLRA."

*GSC Partners*, 368 F. 3d at 246 (citations omitted); *see also Chubb Corp.*, 394 F.3d at 164.

Here, Plaintiff's first Complaint of 128 pages was dismissed for failure to plead with

particularity.  The SAC at issue now is approximately 162 pages and still fails to satisfy the

heightened pleading standards, for largely the same reasons.  In essence, Plaintiff has had two

large bites at the apple and the Court is convinced that a third would not render a different result.

***III. Conclusion***

For the foregoing reasons, Defendants' motion to dismiss is hereby GRANTED.  The

Court hereby DISMISSES Plaintiff's Second Amended Consolidated Class Action Complaint

WITH PREJUDICE.


Newark, New Jersey

Dated: October 26, 2006                              /s/ Harold A. Ackerman

                                                                U.S.D.J.

27